**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| KIMBERLY SUE CARR, | CASE NO. 5:23-CV-00187-BMB |
| Plaintiff, | DISTRICT JUDGE BRIDGET MEEHAN BRENNAN |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE AMANDA M. KNAPP |
| Defendant. | **ORDER** |

Plaintiff Kimberly Sue Carr ("Plaintiff" or "Ms. Carr") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

application for Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter

has been referred to the undersigned Magistrate Judge for a Report and Recommendation

pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of

the Commissioner be **AFFIRMED**.

## I.     Procedural History

Ms. Carr filed her Disability Insurance Benefits ("DIB") application on October 24,

2019, alleging disability beginning June 1, 2021.  (Tr. 69.)  She asserted disability due to visual

impairment, fibromyalgia, chronic fatigue, migraines, and osteoarthritis.  (Tr. 69.)  Her

application was denied at the initial level (Tr. 68, 75) and upon reconsideration (Tr. 76, 82).  She

then requested a hearing.  (Tr. 101.)

1

On November 12, 2020, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 30-67.)   The ALJ issued an unfavorable decision on May 21, 2021, finding Ms. Carr had not been under a disability since October 24, 2019, the date the application was filed. (Tr. 14-29.)  Plaintiff requested review of the decision by the Appeals Council.  (Tr. 147-49.) The Appeals Council denied her request for review on December 15, 2022, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-8.)  Plaintiff filed the pending appeal on January 31, 2023 (ECF Doc. 1), and the matter is now fully briefed (ECF Docs. 8, 10, 11).

## II.      Evidence

### A.      Personal, Educational, and Vocational Evidence

Ms. Carr was born in 1961 and was 57 years old on the alleged disability onset date, making her an individual of advanced age under Social Security regulations on the alleged disability onset date.  (Tr. 69.)  She had at least a high school education.  (Tr. 70.)  Ms. Carr's most recent employment was working as a fitting room assistant at Walmart for about fourteen years.  (Tr. 41, 82, 201.)  Her past relevant work was classified as a composite of sales attendant and telephone operator.  (Tr. 24.)

### B.      Medical Evidence

Ms. Carr has severe physical impairments that were identified by the ALJ (Tr. 19), and only challenges the ALJ's decision with respect to those impairments (ECF Doc. 8).  The evidence summarized herein is accordingly limited to her physical impairments.

#### 1.      Relevant Treatment History

In February 2019, Ms. Carr presented to her primary care provider, Michael Chen, M.D., at Portage Family Medicine-University Hospitals, for a fibromyalgia check-up. (Tr. 270.)  She returned in May to discuss Family Medical Leave Act paperwork.  (Tr. 272.)  In records from

both appointments, Dr. Chen assessed her with fibromyalgia, fatigue, and migraine.  (Tr. 270-71.)  Upon physical examination, Dr. Chen noted no abnormalities, and that Ms. Carr was pleasant, alert, and oriented.  (Tr. 270-71, 272-73.)

Ms. Carr began treating with rheumatologist Kimberly Stewart, M.D., at Unity Health Network, shortly after applying for disability.  (Tr. 562; *see also* Tr. 483-88.)  At her first appointment, on June 20, 2019, she reported arthritis and deformity in her hands, trouble moving around, chronic fatigue, low back pain, and a 2017 diagnosis of fibromyalgia.  (*Id.*)  Dr. Stewart noted that Ms. Carr's examination seemed consistent with fibromyalgia. (Tr. 562.)  Physical examination findings were unremarkable except for some deformity of hands, tender metatarsal phalangeal joints of both feet, and tenderness in her right hip, right foot, and right knee.  (*Id.*)  Dr. Stewart ordered labs and x-rays, and recommended a follow-up in two weeks. (Tr. 562-63.)

Ms. Carr returned to Dr. Stewart two weeks later and was started on Meloxicam for primary osteoarthritis of both hands and fibromyalgia.  (Tr. 560; *see also* Tr. 489-92.)  X-rays of her hands showed gullwing deformity consistent with either erosive osteoarthritis or psoriatic arthritis.  (Tr. 567, 569.)  Dr. Stewart noted she was treating Ms. Carr for osteoarthritis "for now" because she had denied psoriasis.  (*Id.*)  Her examination findings were the same as two weeks prior, with tenderness in her right hip and knee, and both feet, except that her right ankle was not tender.  (Tr. 561.)  Dr. Stewart recommended a follow-up visit in three months.  (Tr. 560.)

On August 7, 2019, Ms. Carr began treating with primary care physician Abigail Cay, M.D., of the Pioneer Physicians Network, reporting fatigue, abdominal pain/vomiting, and acid reflux.  (Tr. 303.)  Other than some abdominal tenderness, objective findings were unremarkable. (Tr. 304-05.)  Dr. Cay ordered labs and an abdominal ultrasound for GI symptoms, and labs and imaging for routine physical exams, weight loss, and chest pain.  (Tr. 305.)  Ms. Carr returned

3

for a follow-up one week later, when she reported still having abdominal pain but no vomiting or chest pains.  (Tr. 296-97.)  Dr. Cay requested a follow-up in four to six weeks.  (Tr. 298-301.) Ms. Carr returned on September 17, 2019, when she denied vomiting or dizziness.  (Tr. 289.)

Ms. Carr returned for a rheumatology follow-up with Dr. Stewart on October 23, 2019. (Tr. 559; *see also* Tr. 507-11.)  Examination findings were the same as her prior appointment: tenderness in her right hip, knee, and ankle, and in both feet.  (Tr. 559.)  Dr. Stewart continued Meloxicam for arthritis.  (*Id*.)

Due to COVID-19 prevention efforts, a follow-up rheumatology visit was conducted via telehealth on April 30, 2020.  (Tr. 556; *see also* Tr. 512-16.)  Ms. Carr reported an hour of stiffness in the morning and again later in the day, and said she was not always sleeping well at night because of aching in her hands and large muscle groups like her thighs.  (Tr. 556.)  She denied joint swelling.  (*Id*.)  Dr. Stewart discontinued Meloxicam and started Etodolac for osteoarthritis and cyclobenzaprine (Flexeril) as needed for sleep.  (*Id*.)  Dr. Stewart recommended a follow-up in 3 to 4 months.  (*Id*.)

Ms. Carr returned to Dr. Stewart about four months later, on August 17, 2020.  (Tr. 553; *see also* Tr. 517-21.)  She reported that she was "about the same" with respect to her fibromyalgia, but that her hand pain was keeping her up at night and she was noticing pain in the balls of her feet.  (Tr. 553.) Dr. Stewart added a diagnosis of rheumatoid arthritis of multiple sites despite negative rheumatoid factor testing (*id*) and started her on Plaquenil (Tr. 521).  On physical examination, Ms. Carr displayed tenderness in her right hip, knee, and foot, but not in her ankle.  (Tr. 553-54.)  Dr. Stewart recommended a follow-up in four months.  (Tr. 553.)

On November 16, 2020, Ms. Carr returned for a follow-up rheumatology visit.  (Tr. 551; *see also* Tr. 522-26.)  She reported good benefit from the Plaquenil.  (Tr. 551.)  Dr. Stewart

decided not to re-test her blood for inflammation at this visit.  (*Id*.)  Ms. Carr also told Dr.
Stewart that she was concerned that she could have postural orthostatic tachycardia syndrome
("POTS") because she was getting dizzy turning over in bed.  (*Id*.)  Ms. Carr also reported that
the swelling in her hands was stable but her feet were sore.  (*Id*.)  Physical examination findings
revealed tenderness of her right hip, knee, and foot, but not her ankle.  (Tr. 551-52.)  Dr. Stewart
recommended a follow-up in four months.  (Tr. 551.)

      Ms. Carr reported dizziness at follow-up appointments with Dr. Cay, her primary care
provider, on January 26 and March 5, 2021.  (Tr. 368, 376.)  On January 26, she said meclizine
was helping with her POTS symptoms;[1] she was able to paint the bathroom, but got dizzy doing
so.  (Tr. 376.)  Dr. Cay started her on hydrochlorothiazide for hypertension at that appointment.
(Tr. 380).  Ms. Carr's other medications—including etodolac for fibromyalgia and meclizine for
POTS—were continued at both visits.  (Tr. 373-74, 380-81.)

      Ms. Carr attended a telehealth appointment with neurologist Deborah Ewing-Wilson,
D.O., of University Hospitals, on January 13, 2021.  (Tr. 353-357, 466-69.)  Dr. Ewing-Wilson
noted that Ms. Carr was there "for evaluation for possible POTS."  (Tr. 354.)  Ms. Carr reported
the following: "[F]ibromyalgia, chronic fatigue, migraines, benign essential tremor (very mild),
but major issue is now dizziness (meclizine is actually helping) and heart racing.  Orthostatics
were positive in her PCP's office."  (Tr. 353.)  Physical examination findings were limited due to
the telehealth format.  (Tr. 356 (some examination categories marked "not tested" or "self
report").)  To the extent Dr. Ewing examined Ms. Carr, the findings were unremarkable except
for "mild tremor with outstretched hands."  (*Id*.)

---

[1]     The exact start date of meclizine is not certain.  During her January 13, 2021 neurology appointment, Ms.
Carr told Dr. Ewing-Wilson that Dr. Cay had prescribed meclizine. (Tr. 354; *see also* Tr. 233.)

A tilt-table test for POTS was conducted on January 29, 2021.  (Tr. 358.)  Ms. Carr's results were interpreted by Bashar Katirji, MD, FACP, FAAN, a neurologist at University Hospitals.  (Tr. 358.) Dr. Katirji found: "This study is borderline normal due to mild orthostatic tachycardia (a 26 bpm rise in hear rate) on tilt table testing. This is suggestive but not diagnostic with [POTS]."  (Tr. 358.)

Ms. Carr returned for a rheumatology appointment on March 15, 2021, four months after her last appointment, reporting intermittent morning stiffness, continued benefit from taking Plaquenil, no swelling, and fatigue.  (Tr. 549; *see also* Tr. 527-31.)  She also reported that she was taking meclizine for vertigo, that her testing for POTS had been borderline, and that she was advised to eat more salt and drink more water.  (*Id*.)  Physical examination findings were otherwise the same as her prior appointment, except that her right ankle was tender again. (Tr. 550.)  Dr. Stewart recommended a follow-up in three to four months.  (Tr. 550.)

## 2.    Opinion Evidence: State Agency Reviewers

State agency physician Gary Hinzman, M.D., reviewed the medical records in evidence as of June 26, 2020 (Tr. 70, 74), and concluded that Plaintiff retained a physical functional capacity consistent with a range of medium work (Tr. 73-74).  The records reviewed included Portage Family Medicine records through July 2019 (Tr. 266-84), North Hampton Primary Care records through May 2020 (Tr. 285-327, 338-47), treatment records for Peter Schmid, O.D. (Tr. 328-37), and the August 2020 psychological consultative examination (Tr. 348-52).  (Tr. 70, 74.)  Dr. Hinzman opined that Plaintiff could perform medium exertional work, with no commercial driving and no unprotected heights due to limitations in near and far acuity.  (Tr. 73.)

At the reconsideration level, state agency physician Leanne Bertani, M.D., reviewed the medical records in evidence, which included no new treatment records (Tr. 78, 81), and adopted

6

the same physical residual functional capacity ("RFC") as Dr. Hinzman on November 5, 2020 (Tr. 80-81).

### 3.  Function Reports

Ms. Carr completed an Adult Function Report on April 25, 2020.  (Tr. 210.)  She reported that she lived in a house with family and was limited from work because of: all-over body pain; stiffness; shakiness, especially hands; difficulty standing or walking for long periods; shortness of breath; anxiety; inability to concentrate on tasks; poor short-term memory; frequent headaches and migraines, often with nausea; arthritis pain, especially right hand and wrist; and visual impairment due to nystagmus (eyes worsening with age).  (Tr. 210.)

With respect to activities of daily living, Ms. Carr reported attending to hygiene, pets, light housework, sitting to watch TV or visit with family, and paying bills.  (Tr. 211.)  Her husband and stepsons helped her with pet and house care.  (Tr. 211-12.)  Before her illness, injury, or conditions, she said she was able to be on her feet longer, do more chores, be more social, read more, and had a better ability to focus and remember.  (Tr. 211.)  Her sleep was affected by body pains and aches, making her unable to get comfortable or stay asleep.  (*Id*.)  Ms. Carr reported no problems with self-care, like grooming or taking medicine. (Tr. 211-12.)  She could prepare simple meals daily and perform light housework daily.  (Tr. 212.)  She went grocery shopping once or twice a week with her husband or mother.  (*Id*.)

She was able to pay bills, count change, handle a savings account, and use a checkbook/money orders.  (Tr. 213.)  She had hobbies and interests that included reading, crocheting, and watching NASCAR.  (Tr. 214.)  She said eye strain and hand pain limited her reading and crocheting.  (Tr. 213.)  She spent time with family, watched TV or movies, chatted on Facebook, and sometimes went out to lunch or dinner.  (Tr. 214.)  She did not need to be

7

reminded to go places, and went to church weekly when she was able, at times helping in the

nursery.  (*Id*.)  Ms. Carr reported frequently canceling social events because she felt too ill or too

tired.  (Tr. 215.)  She is left-handed. (*Id*.)

Ms. Carr said she was limited by her conditions in all areas except for sitting, talking,

hearing, and getting along with others.  (Tr. 215.)  She could walk about twenty minutes before

needing to stop and rest for twenty to thirty minutes before she could resume.  (*Id*.)  She had

worn prescription glasses since age four.  (Tr. 216.)  Her final remarks were as follows:

> The fibromyalgia, chronic fatigue, and headaches are worsened by changes in weather like
> temperature and air pressure. Also, I have frequent flu-like symptoms. I can perform tasks
> such as cleaning only in increments (about 1/2  hour) and have [to] sit down or lay down
> afterward.  I was born with my eye condition and saw a specialist (Jose Melian in Akron,
> Ohio) during my childhood years.  I attempted to get a driver's license but was unable to
> because of my vision.

(*Id*.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

At her May 19, 2021 administrative hearing, Ms. Carr testified in response to questioning

by the ALJ and her counsel.  (Tr. 32-67.)  She said she lived with her husband and two stepsons.

(Tr. 39.)  She had never been able to drive because of visual impairment.  (Tr. 40.)  Her highest

level of education was high school.  (*Id*.)

Ms. Carr described her work history, which comprised about fourteen years at Walmart.

(Tr. 41.)  Her actual title was fitting room assistant, and she spent about half of her time

attending to the fitting rooms and the other half acting as a telephone operator.  (Tr. 41-42.)  She

said she might have to lift or carry up to twenty pounds in that job.  (Tr. 42.)  For the last year

and a half of her employment at Walmart she was a cashier.  (*Id.*)  She became a cashier because

she was having a hard time managing her dizziness and the cashier position was available as a

part-time job.  (Tr. 42-43.)  Also, the hours for fitting room assistant were changing, and she did not have transportation during the new time.  (Tr. 43.)

Ms. Carr said she could not work because she was limited in her ability to walk for long due to dizziness.  (Tr. 44.)  She also said she had to do things in increments with sitting breaks.  (*Id.*)  She could walk for fifteen minutes continuously and stand for thirty minutes continuously.  (*Id.*)  She had not been prescribed an ambulatory device to help with balance.  (Tr. 45.)

Ms. Carr said her doctors did not recommend an exercise routine, but that she did some stretching and light hand weights to stay mobile.  (Tr. 45.)  She had difficulty going up and down the stairs, had fallen two or three times, and had almost fallen a lot of times; but her falls did not result in a need for medical treatment.  (*Id.*)  She held on to the railing for safety and because of her vision problems.  (*Id.*)  She had not added ramps or rails to her home for balance.  (Tr. 46.)

Regarding her fibromyalgia and associated pain, Ms. Carr said the pain was most pronounced in her joints, neck, legs, and back.  (Tr. 46.)  One a ten-point scale, her pain could be up to an eight.  (*Id.*)  She could lift objects weighing up to about ten pounds to waist height, but could not imagine lifting anything heavy over waist height.  (Tr. 46-47.)

Her hands bothered her because of the arthritis.  (Tr. 47.)  She could still write but had difficulty opening jars or buttoning shirts, in part because her hands shook.  (47-48.)  She thought the shaking was associated with her fibromyalgia "and possibly . . . POTS."  (Tr. 48.)  She reported taking medications for arthritis and for dizziness, and had changed medications for arthritis a month before the hearing without seeing improvement or side effects.  (*Id.*)

Ms. Carr also reported fatigue issues, and said it was hard to get a full night's sleep because of leg pain.  (Tr. 48.)  She reported getting about eight hours of sleep a night but not very much REM sleep, and sometimes napped during the day.  (Tr. 49.)  She was able to take her

dog out, shower, do some stretches, have meals, and perform light housework and other household tasks, but she did these things in increments.  (*Id*.)  Other people helped her with heavier chores like vacuuming.  (Tr. 49-50.)  She checked email on a computer and adjusted for her visual impairments. (Tr. 50.)  She liked to read and could do it in increments of about thirty to forty-five minutes because her eyes got tired or she got a headache.  (Tr. 50-51.)   She took prescription medication for her headaches about two or three times a month.  (Tr. 51.)

Ms. Carr said she had problems with chronic fatigue "for a long time," but that it worsened in about 2017.  (Tr. 53.)  When she left Walmart in 2019, she said it was for medical leave, and that she had intended to return to work after finding treatment.  (*Id*.)

Ms. Carr described her symptoms of POTS as follows:

It's a dizziness, like when going from [] to standing up, or the other way around.  A lot of times I get – if I turn around too fast, then I'll get dizzy.  I have to be careful about when I'm moving around, not to move too quickly.  Like bending down, a lot of times will cause me to become dizzy.

(Tr. 53-54.)  When she became dizzy, she would sit or lay down until it passed, which took at least fifteen minutes.  (Tr. 54.)  Ms. Carr also said POTS caused her heart rate to increase when she changed postures, which was "really uncomfortable."  (Tr. 55.)   Her doctor had her using a watch with a heart monitor and prescribed medication for when her heart rate went about 100 beats per minute.  (*Id*.)  With regard to her prior nausea and vomiting symptoms, Ms. Carr reported: "Since I've been home, I've been able to control that better. . . ."  (Tr. 54.)  She had previously experienced nausea and dizziness at work.  (Tr. 56.)

Ms. Carr reported social activities that included church, Facebook, and getting together with friends and family.  (Tr. 56-57.)  She was able to cook and do dishes, but tried to keep cooking and other tasks simple, or to break them down into smaller tasks.  (Tr. 57.)

10

At the beginning of the hearing, counsel reported that the record was complete.  (Tr. 36.)
At the close of the hearing, the ALJ stated to counsel: "My understanding is that the record is
complete and ready for decision." Counsel responded: "Correct."  (Tr. 66.)

### 2.      Vocational Expert's Testimony

A Vocational Expert ("VE") testified.  (Tr. 58.)  The VE classified Ms. Carr's past work
as a composite semi-skilled job that was performed at a light exertional level, made up of sales
attendant (unskilled, light) and telephone operator (semi-skilled, sedentary).  (Tr. 60.)

The ALJ asked the VE whether a hypothetical individual of Ms. Carr's age, education
and work experience with the following limitations could perform her past work:

> [The] hypothetical individual would be at the light exertional range. And we'd have
> the following additional limitations, that she could never climb ladders, ropes, or
> scaffolds. Only occasionally climb ramps and stairs, only occasionally balance,
> stoop, kneel, crouch, and crawl. Now this individual could frequently reach, handle,
> and finger with the bilateral upper extremities. She could frequently perform tasks
> requiring both near acuity and far acuity. And on her own, she could avoid ordinary
> workplace hazards, such as boxes on the floor, doors ajar, and approaching people
> or vehicles. Now she should avoid concentrated exposure to extreme cold and
> vibrations, loud noise, and bright lights, which I'm going to describe as being
> brighter than a typical office setting. And also avoid all exposure to hazards, such
> as unprotected heights, moving, mechanical parts, and the operation of motor
> vehicles.

(Tr. 61-62.)  The VE testified that such an individual could perform Ms. Carr's past work.

If the hypothetical individual was limited to sedentary work, the VE testified that she
could not perform Ms. Carr's past work.  (Tr. 64.)  In addition, if the limitations in bilateral
handling and fingering were reduced from frequent to occasional, or if the limitations in bilateral
reaching were reduced from frequent to occasional, the VE testified that the hypothetical
individual could not perform Ms. Carr's past work.  (Tr. 62.)  The hypothetical person could be
off task on average no more than 10% of the time and/or absent no more than once per month to

maintain employment.  (Tr. 64.)  Organized breaks, however, would not factor into the time off calculations.  (Tr. 65.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is

capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.     The ALJ's Decision

In his September 1, 2020 decision, the ALJ made the following findings:[2]

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.  (Tr. 19.)

2.     The claimant has not engaged in substantial gainful activity since June 1, 2019, the alleged onset date.  (*Id.*)

3.     The claimant has the following severe impairments: osteoarthritis of the bilateral hands, rheumatoid arthritis, fibromyalgia, postural orthostatic tachycardia syndrome (POTS), near syncope/vertigo, chronic fatigue syndrome, congenital nystagmus, alternating esotrophia, and presbyopia (20 CFR 404.1520(c)).  (*Id.*)

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 21.)

5.     The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: The claimant is limited to never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; frequently reach, handle, and finger with the bilateral upper extremities; can frequently perform tasks requiring both near acuity and far acuity, and can on her own avoid ordinary workplace hazards such as boxes on the floor, doors ajar, and approaching people or vehicles; and should avoid concentrated exposure to extreme cold and vibrations, loud noise, and bright lights (brighter than

---

[2] The ALJ's findings are summarized.

a typical office setting), and avoid all exposure to hazards such as unprotected heights, moving mechanical parts, and the operation of motor vehicles (Tr. 22.)

6.  The claimant is capable of performing past relevant work as a sales attendant/telephone operator. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565). (Tr. 24.)

7.  The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2019, through the date of this decision (20 CFR 404.1520(f)). (*Id.*)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from June 1, 2019, through the date of the decision on May 26, 2021. (Tr. 25.)

## V.      Plaintiff's Arguments

Ms. Carr argues the ALJ failed to properly develop the record because he did not procure an opinion of Ms. Carr's physical limitations, either by obtaining a medical source statement from a treating provider or by ordering a consultative examination. (ECF Doc. 8, p. 3.)

## VI.     Law & Analysis

### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245

14

F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

15

**A.      Sole Assignment of Error: Whether the ALJ Failed to Properly Develop the Record**

Ms. Carr argues that the ALJ failed to meet his duty to develop the record.  (ECF Doc. 8,

p. 1; 20 C.F.R. § 404.1512(b).)  Specifically, she argues that the facts in her case compelled the

ALJ to obtain an additional medical source opinion regarding her physical limitations, either

from a treating source or a consultative examination.  (ECF Doc. 8, p. 9.)

**1.      Duty to Develop the Record at Administrative and Hearing Levels**

The Commissioner's duty to develop the record in support of an application for disability

benefits begins during the administrative process, before any request for a hearing before an

ALJ.  The Commissioner must make "every reasonable effort" to develop the medical evidence

in support of an application for disability benefits, including "help[ing]" claimants get medical

evidence from their own medical sources.  20 C.F.R. § 416.912(b)(1)(i) ("We will make every

reasonable effort to help you get medical evidence from your own medical sources and entities

that maintain your medical sources' evidence when you give us permission to request the

reports."); 20 C.F.R. § 416.945(a)(3) ("[B]efore we make a determination that you are not

disabled, we are responsible for developing your complete medical history, including arranging

for a consultative examination(s) if necessary, and making every reasonable effort to help you

get medical reports from your own medical sources.").

Here, the evidence considered at the initial level of review was gathered by the

Commissioner in response to information provided by Ms. Carr in her disability application.

(*See* Tr. 187-89 (Plaintiff's 11/19/2019 summary of treatment providers), Tr. 70 (summary of

evidence considered in 6/26/2020 initial determination).)  Ms. Carr failed to identify new

treatments or providers in her appeal of that decision, and no additional evidence was collected

for review at the reconsideration level.  (*See* Tr. 222 (9/24/2020 appeal identifying no new

treatment or providers), Tr. 78, 81 (no new evidence considered in 11/12/2020 reconsideration determination).)   The medical evidence considered by the state agency medical consultants at both the initial and the reconsideration levels of administrative review was gathered by the Commissioner.  (*See* Tr. 283, 316, 320-26, 328-31, 337, 342, 344-46 (requests for medical records and/or opinions from providers, included with providers' responses).)  With no psychological treatment records in the file, the Commissioner also ordered a psychological consultative examination, which was conducted on August 14, 2020.  (Tr. 348-52.)

At the hearing level, after the denial of benefits on initial review and reconsideration, the Sixth Circuit explains that an ALJ must act "as an examiner charged with developing the facts" and ensure that every claimant receives a full and fair hearing.  *Lashley v. Sec. of Health & Human Services*, 708 F.2d 1048, 1051 (6th Cir. 1983) (quoting *Richardson v. Perales*, 402 U.S. 389, 411 (1971)).  Nevertheless, "while the ALJ must ensure that every claimant receives 'a full and fair hearing,' the ultimate burden of proving entitlement to benefits lies with the claimant." *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022) (quoting *Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847, 856 (6th Cir. 1986); citing 20 C.F.R. § 404.1512(a)), *cert. denied sub nom. Moats v. Kijakazi*, 143 S. Ct. 785 (2023); *see also Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008); 20 C.F.R. § 416.912(a)(1) ("[Y]ou have to prove to us that you are blind or disabled."); 20 C.F.R. § 416.945(a)(3) ("[Y]ou are responsible for providing the evidence we will use to make a finding about your residual functional capacity.").

In special circumstances, the Sixth Circuit has held that an ALJ must "exercise a heightened level of care" in developing the record.  *Lashley*, 708 F.2d at 1051-52.  Heightened care applies to unrepresented claimants who are unfamiliar with hearing procedures and incapable of presenting an effective case.  *See Wilson*, 280 F. App'x at 459 (citing *Lashley*, 708

F.2d at 1051-1052); *Trandafir v. Comm'r of Soc. Sec.*, 58 F. App'x 113, 115 (6th Cir. 2003)

(citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 856 (6th Cir. 1986).  It does

not apply to unrepresented claimants who demonstrate a grasp of the proceedings and adequately

present their cases, *see Moats*, 42 F.4th at 564; *Wilson*, 280 F. App'x at 459, or to claimants who

are represented by counsel, *see Stevenson v. Kijakazi,* No. 5:20CV2688, 2022 WL 4551590, at

*13 (N.D. Ohio Sept. 29, 2022).

Here, Ms. Carr has been represented by counsel since September 2020.  (Tr. 89-92.)  Her

representative submitted most of the medical records added to the file after her reconsideration

denial and request for a hearing.  (*See* Tr. 255, 360-67, 448-55, 472-80, 547.)  He also submitted

a pre-hearing brief in which he summarized various medical records in support of her request for

benefits.  (Tr. 257-65.)  At the hearing before the ALJ, he twice informed the ALJ that the record

was complete.  (Tr. 36, 66.)  Under these circumstances, Ms. Carr has failed to demonstrate that

the Commissioner failed in his duty to develop the record at the administrative level or that the

ALJ had a heightened duty of care to develop the record at the hearing level.

### 2. Plaintiff Has Failed to Demonstrate that the ALJ Had a Duty to Obtain Additional Medical Opinion Evidence

Without arguing that the ALJ had a heightened duty of care, Ms. Carr contends that the

ALJ failed to properly develop the record "when he declined to either obtain a medical source

statement of Plaintiff's limitations from treating sources or order a consultative examination for

an opinion of Plaintiff's limitations."  (ECF Doc. 8, p. 7.)  Relying on the standard articulated in

*Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908 (N.D. Ohio 2008), Ms. Carr argues that the

ALJ was under a legal duty to obtain additional medical opinion evidence because the state

agency medical consultants—who rendered the only medical opinions as to Ms. Carr's physical

residual functional capacity—"had no opportunity to review the 2021 records from Pioneer

Physician's Network and Unity Health Network, documenting the positive tilt test study or the evidence of rheumatoid arthritis, dizziness, hypersomnia, migraines, and tremor." (ECF Doc. 8, p. 10; *see also* ECF Doc. 12, p. 5-6.) The Commissioner responds that the ALJ acted within his discretion in finding the record sufficient for resolution. (ECF Doc. 10, p. 1.)

Ms. Carr's arguments rely on the legal standard articulated in *Deskin*, a 2008 decision that sought to articulate a "general rule" for when ALJs should seek additional medical opinion evidence. (*See* ECF Doc. 8, pp. 10-13 *and* ECF Doc. 11, pp. 1-7 (citing *Deskin*, 605 F. Supp. 2d 908).) The *Deskin* judge revisited the standard in *Kizys v. Comm'r of Soc. Sec.*, where he clarified that *Deskin* states "a narrow rule that does not constitute a bright-line test." No. 3:10 CV 25, 2011 WL 5024866, at *1–2 (N.D. Ohio Oct. 21, 2011). Both decisions argue that an ALJ should obtain additional medical opinions when: (1) there is *no* medical source opinion in evidence; or (2) the only opinion in evidence is an "outdated" opinion from a non-examining source (like a state agency consultant). *Kizys*, 2011 WL 5024866 at *2 (citing *Deskin*, 605 F. Supp. 2d at 912). An opinion is considered "outdated" when the unreviewed medical evidence is a "critical body of objective evidence." *Id.* But where the medical evidence shows "relatively little physical impairment," both *Deskin* and *Kizys* agree that an ALJ can "render a commonsense judgment about functional capacity" without obtaining another medical opinion. *Id.*

But *Deskin* is not binding authority and several courts in this District have criticized or declined to follow the *Deskin* standard. *See, e.g., Winans v. Comm'r of Soc. Sec.*, No. 5:22-cv-01793, 2023 WL 7622634, *4 (N.D. Ohio November 15, 2023); *Fox v. Comm'r of Soc. Sec.*, No. 5:23-CV-580, 2023 WL 7018362, at *8-9 (N.D. Ohio Oct. 10, 2023) (noting *Deskin* is not controlling and finding "the ALJ had sufficient evidence to make his determination and the record doesn't establish that a consultative examination was necessary"), *report and*

19

*recommendation adopted*, No. 5:23 CV 580, 2023 WL 7222824 (N.D. Ohio Nov. 2, 2023);

*Davidson v. Comm'r of Soc. Sec.*, No. 3:22CV938, 2023 WL 5948122, *4 (N.D. Ohio Sept. 13,

2023) ("This Court has itself recently determined reliance on 'stale' non-examining state agency

opinions does not require remand." (citing *Van Pelt v. Comm'r of Soc. Sec.*, No. 1:19 CV 2844,

2020 WL 7769729, at *10-11 (N.D. Ohio Dec. 30, 2020) (discussing Sixth Circuit decisions

contrary to *Deskin* and finding reliance on "outdated" non-examining state agency opinions did

not require remand where the ALJ considered subsequent medical evidence)); *Adams v. Colvin*,

No. 1:14CV2097, 2015 WL 4661512, at *15 (N.D. Ohio Aug. 5, 2015) (collecting cases);

*Williams v. Astrue*, No. 1:11-CV-2569, 2012 WL 3586962, at *7 (N.D. Ohio Aug. 20, 2012)

(holding "*Deskin* 'is not representative of the law established by the legislature, and [as]

interpreted by the Sixth Circuit Court of Appeals'" (quoting *Henderson v. Comm'r of Soc. Sec.*,

No. 1:08 CV 2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010))).  As one court explained:

> Deskin is a non-binding district court decision that conflicts with the regulations
> and Sixth Circuit case law. . . . By requiring an ALJ to secure a medical opinion
> whenever the record does not contain such an opinion, subject to only limited
> exceptions, Deskin places a higher burden on the ALJ than the Sixth Circuit does.

*Winans*, 2023 WL 7622634, *4 (citations omitted).

A review of Sixth Circuit caselaw supports a finding that *Deskin* is not consistent with

governing precedent.  In *McGrew v. Comm'r of Soc. Sec.*, the Sixth Circuit rejected an argument

that an "ALJ improperly relied on the state agency physicians' opinions because they were out of

date and did not account for changes in her medical condition," finding it sufficient that the ALJ

considered later medical examinations and assessments and "took into account any relevant

changes in [the claimant]'s condition."  343 F. App'x 26, 32 (6th Cir. 2009).  And while the

Sixth Circuit held in *Blakley v. Comm'r of Soc. Sec.* that there must be "some indication that the

ALJ at least considered" medical evidence that post-dates a non-examining source opinion

"before giving greater weight to an opinion that is not 'based on a review of a complete case record,'" the *Blakley* court did not hold that such consideration must be supported by a new medical opinion.  581 F.3d 399, 409 (6th Cir. 2009) (quoting *Fisk v. Astrue*, 253 Fed.Appx. 580, 585 (6th Cir.2007) (quoting Soc. Sec. Rul. 96–6p, 1996 WL 374180, at *3)).  District courts have therefore concluded that "[a]n ALJ need not 'obtain[] updated opinion evidence, so long as the ALJ's ultimate decision is supported by substantial evidence."  *Davidson*, 2023 WL 5948122 at *4 (quoting *Van Pelt*, 2020 WL at *12 (citing *McGrew*, 343 F. App'x at 32)).

These findings are also consistent with the Sixth Circuit's holding in *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, that an ALJ "was not required to get the opinion of another physician before setting the residual functional capacity," despite giving "no weight" to the other medical opinions of record.  732 F. App'x 395, 401 (6th Cir. 2018).  The court noted it had "previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."  *Id.* at 401-02 (citing *Shepard v. Comm'r of Soc. Sec.*, 705 Fed.Appx. 435, 442–43 (6th Cir. 2017) *and Rudd v. Comm'r of Soc. Sec.*, 531 Fed.Appx. 719, 728 (6th Cir. 2013)); *see also Van Pelt*, 2020 WL 7769729, at *10-11 (finding *Mokbel-Aljahmi* to be "contrary" to an argument that "the lack of any medical opinion evidence for . . . physical impairments, apart from two outdated opinions from non-examining physicians, denotes a lack of substantial evidence supporting the RFC").

The regulations governing consultative examinations are also consistent with a finding that the *Deskin* standard is more restrictive than statutory requirements.  The regulations provide that an ALJ "may" order a consultative exam if the medical record is insufficient.  20 C.F.R. §§ 404.1512(b)(2); *see also* 20 C.F.R. § 416.917 and 20 C.F.R. § 404.1545(a)(3).  Indeed, the Sixth Circuit has expressly confirmed that it is within an ALJ's "discretion to determine whether

further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001); *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant [her] the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination."); *see also Cox v. Comm'r of Soc. Sec.*, 615 F.App'x 254, 263 (6th Cir. 2015) (finding an "ALJ's duty to develop the record" does not necessarily "require the ALJ to order a consultative examination").

Thus, neither Sixth Circuit precedent nor the governing regulations support a finding that an ALJ errs as a matter of course if he does not obtain a new medical opinion whenever (1) non-examining state agency opinions are the only opinions in evidence and (2) new medical records are submitted following a reconsideration-level denial.  Such a standard could turn Plaintiff's burden of proof on its head and effectively mandate that the Commissioner order consultative examinations that are discretionary under the regulations, which provide only that a consultative examination "may" be appropriate "to secure needed medical evidence, such as clinical findings, laboratory tests, a diagnosis, or prognosis" in situations such as:

> (1) The additional evidence needed is not contained in the records of [Plaintiff's] medical sources;
>
> (2) The evidence that may have been available from [Plaintiff's] treating or other medical sources cannot be obtained for reasons beyond [Plaintiff's] control, such as death or noncooperation of a medical source;
>
> (3) Highly technical or specialized medical evidence that [the Commissioner] need[s] is not available from [Plaintiff's] treating or other medical sources; or
>
> (4) There is an indication of a change in [Plaintiff's] condition that is likely to affect [Plaintiff's] ability to work, but the current severity of [Plaintiff's] impairment is not established.

20 C.F.R. § 404.1519a(b).  For these reasons, the rule Ms. Carr proposes to apply is not consistent with the law and regulations that govern this Court's determinations.

This analysis is not affected by Ms. Carr's argument on reply that a medical opinion was required to address "raw evidence" in a "tilt test supporting [her] claim of postural orthostatic tachycardia syndrome." (ECF Doc. 11, p. 4.) The report and recommendation Ms. Carr cites in support of this argument was rejected in part by the reviewing court, which disagreed with the magistrate judge's conclusion that "the ALJ improperly interpreted raw medical data when the ALJ evaluated medical evidence without the benefit of a medical opinion." *Winans*, 2023 WL 7622634, at *5 (adopting in part and rejecting in part *Winans v. Comm'r of Soc. Sec.*, No. 5:22-CV-1793, 2023 WL 5043820 (N.D. Ohio June 8, 2023)). The court explained:

> True, ALJs are "generally unqualified to interpret raw medical data and make medical judgments concerning the limitations that may reasonably be expected to accompany such data." But at the same time, Social Security regulations "require the ALJ to evaluate the medical evidence to determine whether a claimant is disabled." Far from prohibiting ALJs from directly evaluating medical evidence, the law requires it.

> The Sixth Circuit has also held that ALJs are "not required to obtain a medical expert to interpret the medical evidence related to [a claimant's] physical impairments." So, an ALJ does not improperly "interpret raw medical data" simply by evaluating the medical evidence without the benefit of a medical opinion.

> Sometimes, ALJs need medical opinion evidence. Sometimes not. The administrative record evidence determines whether an ALJ could permissibly review the medical evidence without a medical opinion.

*Id.* (citations omitted).

It is also important to note that "an ALJ does not interpret 'raw medical data' where it has already been 'read and interpreted' by a medical professional." *Kleinhaus v. Kijakazi*, No. 3:23-CV-00173, 2023 WL 7923901, at *8 (N.D. Ohio Sept. 28, 2023) (citing *Rudd*, 531 F. App'x at 727) (finding an ALJ did not "interpret raw medical data beyond her ability" where the only "raw medical data" was x-rays of hands and spine, which had been read and interpreted by a radiologist); *see also Kidder v. Comm'r of Soc. Sec.*, No. 1:18-CV-661, 2020 WL 1080413, at *6 (S.D. Ohio Mar. 6, 2020), *report and recommendation adopted*, No. 1:18-CV-661, 2020 WL

5201080 (S.D. Ohio Sept. 1, 2020) (finding an ALJ did not interpret raw medical data where EMG had been interpreted by treating physician).

Ultimately, "[t]here is no categorical requirement that the non-treating source's opinion be based on a complete or more detailed and comprehensive case record." *Helm v. Comm'r of Soc. Sec.*, 405 F. App'x. 997, 1002 (6th Cir. 2011) (internal citations and quotations omitted). "The opinions need only be supported by evidence in the case record." *Id.* Of course, there must be "some indication that the ALJ at least considered" the later medical records. *Fisk*, 253 F. App'x. at 585; *Blakely*, 581 F.3d at 409 (quoting *Fisk*, 253 Fed. Appx. at 585).

As set forth above, the question this Court is empowered to answer is whether the ALJ's RFC was supported by substantial evidence, even in the absence of additional opinion evidence. Ms. Carr's specific argument that the ALJ was obligated under *Deskin* to obtain a new medical opinion evidence simply because Ms. Carr had submitted new medical treatment records without also submitting (or asking the Commissioner to obtain) new medical opinion evidence, must fail.

Reviewing the record under the substantial evidence standard, it is evident that the ALJ considered the additional treatment records that were submitted by Ms. Carr after the denial of her claim at the reconsideration level. He discussed those records as follows:

> In August of 2020, the claimant presented to Dr. Cay at Pioneer Physicians Network for a follow up visit regarding fibromyalgia and her other physical health impairments. According to the claimant, she was seeing Dr. Stewart for fibromyalgia, was watching her diet and exercising, and her sleep and appetite were good with taking Duloxetine (Exhibit 7F, pg. 23). A physical examination performed at this time revealed that the claimant was alert and oriented to all spheres, her mood was pleasant, and there was no edema in the extremities. Based on these findings, Dr. Cay diagnosed the claimant with various conditions such as fibromyalgia, anxiety, and GERD (Exhibit 7F, pg. 25). In addition, Dr. Cay advised the claimant to continue taking her medications as prescribed, including Etodolac tablets on a daily basis for fibromyalgia (Exhibit 7F, pg. 26). The claimant underwent a 24-hour Holter heart monitor study in December of 2020 based on a history of tachycardia symptoms, which was a negative study (Exhibit 7F, pg. 2). On January 13, 2021, the claimant presented to Dr. Ewing-Wilson for

24

a follow up visit regarding multiple issues, including fibromyalgia, chronic fatigue, and migraines. Treating notes indicate that the claimant initiated taking Amitriptyline at her last visit because Gabapentin was not helping with her pain, and she had no change in her symptoms since then. According to the claimant, she was still experiencing generalized fatigue, was aching all over, and wanted to sleep a lot, including sleeping 10 to 11 hours per night, but her migraines were controlled (Exhibit 6F, pg. 1). A physical examination performed at this time revealed that the claimant had muscle strength of five out of five throughout, there was a mild tremor in her outstretched hands, her gait was normal, and cranial nerves were intact (Exhibit 6F, pg. 4). Based on these findings, Dr. Ewing-Wilson diagnosed the claimant with various conditions such as migraines and tremors (Exhibit 6F, pg. 3). On January 29, 2021, the claimant underwent a tilt test study, which revealed findings that were borderline normal due to mild orthostatic tachycardia, with findings that were suggestive of, but did not provide diagnostic confirmation of POTS (Exhibit 7F, pg. 2).

(Tr. 22-23.)  He also considered the fact that the state agency medical consultants did not review that later-submitted evidence in reaching their medical opinions, stating:

Finally, I find the State agency medical consultants' physical assessments unpersuasive, who limited the claimant to a range of medium level work (Exhibit 2A; 4A). These opinions were based on information contained in the record at the time of the State agency reconsideration determination in this case, and no medical records generated or provided after that date were considered by the state examiners. However, additional medical evidence received in the course of developing the claimant's case for review at the administrative hearing level justifies a conclusion that the claimant's impairments are more limiting than was concluded by the state examiners. Nevertheless, I agree with the DDS consultants that the claimant's physical impairments are not disabling in nature for the reasons listed above, including her generally benign diagnostic and clinical findings, her mostly conservative treatment history for her physical health issues since the alleged onset, and her varied activities of daily living that indicate a greater level of functioning than alleged at the hearing.

(Tr. 24 (emphasis added).)  The ALJ's characterization of Ms. Carr's diagnostic and clinical findings as "mostly benign" is consistent with a review of the entire medical record, as detailed in Section II.B.1., *supra*, where abnormal findings on physical examination are primarily limited to tenderness and mild tremor, x-rays showed some gullwing deformity in her hands, and tilt-table testing was "borderline normal."  (*See, e.g.,* Tr. 356, 358, 550, 551-52, 553-54, 559, 561, 562, 567, 569.)  The ALJ's characterization of her treatment history as mostly conservative is

also consistent with the medical record.  The records show regular appointments usually three to four months apart with her primary care provider, Dr. Cay, and her rheumatologist, Dr. Stewart. (Tr. 368-456; 549-575.)  At the time of her hearing, Ms. Carr used a computer for emails and Facebook, read and crocheted with breaks, did light housework and socialized in limited amounts, and took prescription medication to control pain and dizziness.  (Tr. 55, 213-15, 354.)

After reviewing the records that were not before the state agency consultants, the ALJ found their opinions that Ms. Carr could perform medium work "unpersuasive" and limited her to light work with limitations in climbing, postural positions, and the use of her hands, and with further limitations in exposure to cold, vibrations, loud noise, bright lights, and hazards such as unprotected heights, moving mechanical parts, and the operation of motor vehicles.  (Tr. 21-22, 24.)  Ms. Carr has not shown that the medical record lacked substantial evidence to support the ALJ's adoption of these additional limitations without first obtaining a new medical opinion.

Ms. Carr argues more specifically that a new medical opinion was needed to address the following "new evidence":

- Ms. Carr's report to neurologist Dr. Ewing-Wilson on January 13, 2021, that her primary care provider "did orthostatic BPs" which Ms. Carr said "were 'positive,'" her report to Dr. Ewing-Wilson that she "also noted tremor over the past year," and Dr. Ewing-Wilson's review of a holter monitor report which "showed brady/tachy."  (Tr. 355);

- An Autonomic Report by Dr. Katarji, observing: "This study is borderline normal due to mild orthostatic tachycardia (a 26 bpm rise in heart rate) on tilt table testing," which was "suggestive but not diagnostic with the [POTS]."  (Tr. 358);

- Medical history notes for a March 5, 2021 primary care appointment with Dr. Cay which note negative results for the December 28, 2020 24-hour Holter monitor and "borderline normal" results for the January 29, 2021 tilt test.  (Tr. 369);

- A list of "Problems" from her June 20, 2019 rheumatology appointment with Dr. Stewart, listing rheumatoid arthritis, fibromyalgia, and osteoarthritis of both hands.  (Tr. 483).

(*See* ECF Doc. 8, pp. 11, 13 and ECF Doc. 12, p. 4 (citing Tr. 355, 358, 369, 483).)  As discussed above, the ALJ explicitly considered Ms. Carr's arthritis, fibromyalgia, and

26

"borderline normal" tilt table testing in adopting his RFC, and Ms. Carr has not shown that the ALJ's decision lacked substantial evidence in the absence of a new medical opinion.

Returning to Ms. Carr's argument that the ALJ needed a new medical opinion to address the "raw data" of her tilt-table testing, the Autonomic Report was not "raw data." Dr. Katarji reviewed and interpreted the results of the tilt-table testing and opined that the study results were "borderline normal" and "suggestive but not diagnostic" of POTS. (Tr. 358.) The ALJ was not required to obtain a medical opinion before considering these test results. *See Winans*, 2023 WL 7622634, at *5; *Rudd*, 531 F. App'x at 727. It is also evident that the ALJ did account for the results of this testing, as the RFC included both environmental limitations and a requirement that Ms. Carr avoid all exposure to specified hazards. (Tr. 21-22.)

Although not dispositive, it is noted that Ms. Carr's representative did not request—in his pre-hearing brief or at the hearing—that the ALJ order a physical consultative examination or assist Ms. Carr in gathering additional medical opinion evidence. (Tr. 36, 66, 257-65.) This failure further undermines Mr. Carr's arguments in this case. *See Campbell v. Comm'r of Soc. Sec.*, No. 1:12CV1406, 2013 WL 1908145, at *8 (N.D. Ohio May 7, 2013) ("At the hearing, counsel did not indicate or suggest to the ALJ that any medical records were missing from the administrative record, nor did counsel ask for the ALJ's assistance in obtaining any additional medical records. Although the ALJ has the duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record and later fault the ALJ for not performing a more exhaustive investigation.") (*citing Branum v. Barnhart*, 385 F.3d 1268, 1271 (10th Cir. 2004) ("[The ALJ should] ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored, and the ALJ may ordinarily require counsel to identify the issue or issues requiring further

development.") (internal quotes and citation omitted); *cf. Hopkins v. Comm'r of Soc. Sec.*, 96 F. App'x 393, 395 (6th Cir. 2004) (finding ALJ did not need to request additional testing where claimant was represented by counsel, did not request additional testing at the hearing, and where claimant's conditions were well documented on the record).

Even if this Court were to apply the *Deskin* standard, the undersigned finds the result would be the same. *Kizys* narrowed the standard to cases where there is a "critical body of objective evidence" not accounted for by a medical opinion, *Kizys*, 2011 WL 5024866 at *2, with some courts adding that there must be "significant evidence of potentially disabling conditions," *Gonzales v. Comm'r of Soc. Sec.*, No. 3:21-CV-00093-CEH, 2022 WL 824145, at *8 (N.D. Ohio Mar. 18, 2022) (citations omitted). The undersigned does not find the new evidence of conservative rheumatological treatment and a non-diagnostic tilt-table test to be a "critical body of objective evidence" requiring the review of a medical expert or "significant evidence of potentially disabling conditions." Thus, the undersigned finds Ms. Carr has failed to demonstrate error even if the *Deskin* standard were applied in this case.

For the reasons set forth above, the undersigned finds that Ms. Carr's sole assignment of error lacks merit. She has not shown that the ALJ erred when he did not obtain additional medical evidence, and she has not demonstrated that he lacked substantial evidence to support his adoption of the relevant RFC without first seeking additional medical opinion evidence.

### VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the

Commissioner be **AFFIRMED**.


January 8, 2024


/s/*Amanda M. Knapp*

AMANDA M. KNAPP
United States Magistrate Judge



### **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).